BENJAMIN O. KEATON, trustee, *et al.*, plaintiffs in error, *vs.* LEONIDAS A. JORDAN, defendant in error.

1. In 1851, K. made his will, providing that at his death all the property he should be possessed of should be divided into five shares. He disposed of these shares to his grand-children, but provided that their parents, his sons and daughters, should have the use and control during their lives. In 1854 he delivered to his sons and daughters certain parcels of land, valuing the land given to each at $8,000 00, and taking written papers, duly sealed and witnessed from each, acknowledging that they had received the property described "as part of my portion of his" (the father's) "estate under his will, and which I am to hold as his will directs after his death, and which is to be taken and considered as a part of my portion directed to be given me by the will aforesaid." The father caused these papers to be duly recorded in the record book of the clerk's office of the county where the lands were situated. In 1859 one of the sons sold his land to his brother, W. In 1862, W. sold his tract, as well as that he bought from his brother, to J., who bought without notice of any defect in W.'s title, except the constructive notice arising from the record of the several papers taken by the father from the son, and by him recorded at the time he delivered them the possession. The sons have both died, one leaving children. The father is still living:

*Held,* as against a purchaser from the son the father is estopped from setting up any title to the land inconsistent with that described in the written acknowledgment taken by him from the son, and by him put upon record.

2. J. got from the son such title and such right to the land as is described in said papers so duly recorded, as belonged to the sons, according to the legal tenor and effect of said papers.

3. The legal effect of the said recorded papers is that the sons took the property described as an advancement, and as their own property, with the condition attached that they should hold it subject to the disposition their father might make of it by his will and at his death, which condition was repugnant to the grant and void.

4. The understanding or agreement, if there was any such, between the father and the sons, that the reference in the receipts or acknowledgments to the father's will, was not to the will, as a will, but only as a paper describing the nature and extent of their title to the property received, whatever might have been its effect between the parties, cannot affect a purchaser from the sons who has a right to stand upon *the legal effect* of the papers, taken by the father, as the measure of the sons' title.

Will. Receipt. Estoppel. Parent and child. Advancement. Notice. Record. Trusts. Before Judge STROZER. Dougherty Superior Court. April Adjourned Term, 1873.

On the 4th day of January, 1851, Benjamin O. Keaton executed in due form of law his will, by the first item of which he provides for the division of his entire estate into five equal lots or shares, and by the second and third items he sets apart two of said five shares, one to each of his two sons, Benjamin W. Keaton and William W. Keaton, vesting the fee in his grand-children, with power to his two said sons to manage and control said property during their natural lives, using the proceeds and profits for themselves, and for the support, maintenance and education of their children, and at the death of said sons all to go to the children. By another subsequent item he provides that in the event of the death of either, without children or wife, then the share of that one was to go to his grand-children, each family of them to take share and share alike, and in the event either of said sons left a wife with surviving children, then the wife to control for the children in the same manner as the husband did until her death or marriage. There were other items not directly bearing on the issues in the case. Said Benjamin O. Keaton, after executing said will, to-wit: on the 30th December, 1854, delivered to one of said sons, William W. Keaton, a large amount of real and personal property, embracing lots of land

numbers seventy-nine and eighty, in the second district, and number four hundred and twelve, in the first district, of said county, valued at $8,000 00, and took from said William W. Keaton the following instrument in writing:

"The following negroes, to-wit:   *   *   *   *   Also those three lots of land distinguished by the numbers seventy-nine and eighty, in second district, and four hundred and twelve, in the first district, of Dougherty county, and valued at $8,000, which I receive from my father, Benjamin O. Keaton, as a part of my portion of his estate under his will, and which I am to have and to hold as his will directs, after his death, and which is to be taken and considered as a part of my portion of said Benjamin O. Keaton's estate, directed to be given me in the will aforesaid.    Albany, December 30th, 1854.
　　　(Signed)　　　　　　　　"W. W. KEATON.
"Signed in the presence of William W. Cheever.
　　　　　　　"YOUEL G. RUST, Notary Public.   [L.S.]"

Recorded in the clerk's office of the superior court, 19th January, 1855.

And on the 7th June, 1854, said Benjamin O. Keaton had taken just such a writing from his son, Benjamin W. Keaton, except that it was for different personal property, and for lots four hundred and twenty-one, in the first district, and four hundred and forty-one, and two hundred and eighty, in the second district, of Dougherty county, and known as the "James Keaton place," valued at same price, $8,000 00, signed by B. W. Keaton, and witnessed by Marx Smith and John Jackson, J. I. C.    Recorded in clerk's office superior court, August 5th, 1854.

On the 1st day of June, 1856, said Benjamin O. Keaton sold, and executed a deed in fee simple to said sons, William W. and Benjamin W. Keaton, eight hundred and eighty-eight acres of land adjoining the said lots in dispute, making a settlement, when added to the fifteen hundred acres in dispute, of two thousand three hundred acres.    On the 15th De-

cember, 1859, William W. Keaton executed a deed in fee simple to Benjamin W. Keaton, of all his interest in the lands in dispute and others.   On the 3d December, 1862, Benjamin W. Keaton executed a deed in fee simple to Leonidas A. Jordan to said lands in dispute, with other lands adjoining, aggregating two thousand four hundred and thirty-nine acres, of which Jordan took possession.   William W. Keaton had, before this, taken possession of lands in Baker county, which in part he obtained from Benjamin W. Keaton for his interest in the Dougherty county lands.   Benjamin W., after his sale to Jordan, bought and settled upon two thousand seven hundred acres of land in Early county.   In the first part of the year 1862, William W. Keaton died, leaving neither wife nor children, and about Christmas eve, 1868, Benjamin W. Keaton died, on the Early county place, leaving a wife and three or four children—plaintiffs in error·   About one year thereafter said widow intermarried with J. E. Hightower, who afterwards became the guardian of said Benjamin W. Keaton's children—all minors.   Said Benjamin O. Keaton had, besides said two sons, a daughter and a younger son.   The daughter intermarried about 1850 with W. W. Kendrick, and died about 1868, leaving five children, all minors at the institution of this suit, and plaintiffs in error therein, by their trustee, Benjamin O. Keaton.   About the year 1869, the father of these children, W. W. Kendrick, also died.

Thus stood the parties and their titles to the land in dispute at the commencement of suits in ejectment in November, 1869, by Benjamin O. Keaton, trustee for the children of W. W. Kendrick, and J. E. Hightower, as guardian of the children of Benjamin W. Keaton, in Dougherty Superior Court, *vs.* Leonidas A. Jordan.   Pending said ejectment suits, and in the month of September, 1870, said Jordan filed his bill in said court for relief, etc., against said plaintiffs in ejectment, praying a discovery and injunction, which injunction was granted by the judge of said court until the hearing, and to which bill Benjamin O. Keaton filed his answer, January 8th, 1871, and upon this bill and answer, with the evidence that

follows, was the trial had, at April adjourned term, 1873. The bill set out, as exhibits, the deeds and receipts, as before set forth, and the suits in ejectment, and alleges that under said receipts and deeds a good and perfect title to said lands passed to Jordan from William W. and Benjamin W. Keaton, and that Benjamin O. Keaton had full knowledge of the trade at the time it was made, and not only made no objection to it, but approved it, and promised to bring in or send the back titles to Jordan, and that they were so brought or sent. The bill also set up that the funds paid by Jordan to Benjamin W. Keaton, went to purchase the lands in Early— two thousand seven hundred acres. It was agreed between the attorneys for complainant and defendants, that the answer of Hightower be dispensed with, as Benjamin O. Keaton, who had filed his answer, knew more of the matter than Hightower. Complainant's bill prayed a decree for perpetual injunction against the ejectment suits.

Defendant's answer denied the charges in the bill that there was any title in William W. and Benjamin W. Keaton in fee to said lands from him, by gift or otherwise, but alleged that they merely held them in trust for defendant's grand-children, the plaintiffs in ejectment, and that the said lands were delivered to said William W. and Benjamin W. Keaton by him, B. O. Keaton, under said receipts, with the terms in his then existing written will well known to them and thoroughly understood by them; that they received said lands in trust for said grand-children, and they so took and held them, and that he had no knowledge of their setting up a prior claim in themselves until the sale was made to Jordan in 1862, and then not until the sale was made and completed, defendant refusing to recognize or consent to it. The answer further showed that three pine woods lots, first given to Benjamin W. Keaton in the receipt, were, at his request, changed and three lots in the oak woods substituted, and that said Benjamin W. received and took possession of them under the same trusts and limitations. Also denies the charge of having consented to the trade to Jordan, and of any conversation

Keaton *et al. vs.* Jordan.

with Jordan on the subject, or of consenting to the delivery of back titles; also, that he had no knowledge of the investment, so far as the Early county lands were concerned, and asks that complainant prove it; but answers that the Early county lands did not cost one-half of the lands in dispute, and was not now more than one fourth their value; and denies the purchase of the stock with the funds of Jordan; also states that the will before alluded to and set out as an exhibit to the answer, was his will at the time, and is yet, and will be at his death; that its terms, referred to in the receipts, were well known and fully understood at the time the receipts were executed and the property delivered; that the said William W. and Benjamin W. Keaton so received the property under said receipt in trust as aforesaid, and so continued to hold it, so far as defendant knew, until the time aforesaid, in 1862.

Said receipts, deeds and will, were all introduced in evidence, and Henry Turner testified that he was overseer upon the place in dispute for Benjamin W. and William W. Keaton in 1855, 1856 and 1857; they treated the land as their own and claimed it as such, so far as he knew; Benjamin O. Keaton was frequently on the place, sometimes as often as two or three times a week, and must have known of the sale from William W. to Benjamin W. Keaton, but could not say that he ever heard him say the land belonged to them; only heard him say to them that the land he had given them and the land he had sold them would make them a splendid plantation; also, that Benjamin W. Keaton built a good framed dwelling house, and made other improvements on his place, and gathered and sold crops as if the place were his own.

Jordan testified, that not long after he bought said lands of Benjamin W. Keaton, Benjamin O. Keaton said to him that Wash had made a good trade, and that he (B. O. Keaton) would send him the back deeds to the land, and that he afterwards got them from Vason & Davis, Jordan's attorneys, but could not say who gave them to Vason & Davis; that he had no notice of the said will and receipts, but never examined the records as to Benjamin W. Keaton's title.

Y. G. Rust testified for the defendants, that he drew and witnessed the receipt from William W. Keaton to Benjamin O. Keaton; they were both present at the time, and thinks the will was present; his reason for thinking so is, that when he drew the receipt, the terms of the will were understood by him, and as he never saw it before or after that time, thinks he must have seen it then, but of this he is not positive; that he drew the receipt by one of a similar kind.

Henry Morgan identified the will, having drawn it for Keaton and witnessed it in 1851.

Benjamin O. Keaton testified substantially to the facts stated in his answer. Also, that there was, in the year 1862, about seven hundred acres of cleared land on the premises in dispute, which was worth, from that time to the trial, $3 00 per acre per annum, in good money.

The jury found for complainant, and a decree was accordingly entered. The defendants moved for a new trial upon numerous grounds, which are not set forth for the reason that the exception to the charge of the court presents substantially the issues of law made.

The court charged the jury as follows: "If you should be of opinion, from the testimony, that Benjamin O. Keaton gave to his sons the lands in dispute, then he had the right to place upon it such limitation as the owner thought proper to reserve or place upon it. If you believe from the evidence that respondent placed his sons in possession of the premises to hold in trust for other persons, and the same was declared, and the sons accepted the gift, then the sons would hold as trustees for their *cestui que trusts*, and would be liable. Should you believe that the gift was made as above stated, if they sold the estate to an innocent purchaser—that is, without notice, either actual or constructive—then he would hold the property free from such trust; his title to the property would be good.

"In order for a gift to be good, there must be an intention by the owner to give, an acceptance by the donee agreeable to its terms. A gift to a child may arise in this wise: where he

Keaton *et al. vs.* Jordan.

has exclusive possession of lands belonging originally to the father, without payment of rent for the space of seven years, raises a conclusive presumption of a gift and conveys title to the child, unless there is evidence of a loan or a claim of dominion by the father acknowledged by the child, or a disclaimer of title by the child. What is the evidence on these points, applied to the law as thus given? Was there a gift in writing? And was there any trust reserved, and if so, did the trustee sell the property to a *bona fide* purchaser, or did the purchaser have actual or constructive notice of the trust? Or did the son go into the possession of the land of his father, and he and his vendee hold the same for seven years, not being a loan? Did the father claim any dominion over it, and did the child acknowledge it? If so, and the complainant was notified, or had notice of it, then complainant would be bound by it. But if the owner stood by and permitted complainant to purchase without the assertion of any dominion over it, and permitted complainant, under a purchase from his sons, to go on and make valuable improvements upon it, then he would be bound by such acquiescence.

"In order for the record of an instrument to become notice to a party, it must be such an instrument as the law requires to be recorded. But if the property was given them in trust for a third person, and the same was in writing, or declared in writing, then they would hold as trustees for the *cestui que trust*, and could not divest his right to pursue the property, unless it was to a *bona fide* purchaser without notice of such trust. And such trust may be evidenced by any writings that show the intention of the party to create a trust."

The motion was overruled and defendants excepted.

L. P. D. WARREN; G. J. WRIGHT, for plaintiffs in error.

LYON & IRVIN, for defendant.

Keaton *et al. vs.* Jordan.

McCay, Judge.

1. The object of this suit seems to be to set up a trust created under the will of a man who is not yet dead. This, as it seems to us, is absurd, since the maker of the will may or may not have such a will·as this at his death. There is nothing, so far as we can see, to prevent him from revoking it at any time. The rights of the parties must, as it seems to us, turn on the rights of *Mr. Keaton,* the maker of the will. Has the defendant got a good title as against him ?.

2. When he put his sons in possession of this land and took from them and spread upon the records of the county the written acknowledgments of the nature of their rights, he and they, as against each other, and the privies of each, are estopped from setting up any title inconsistent with those papers. True, the father signed neither of them.· But he accepted them from the sons as containing the description of the title they had. They are estopped by their deeds—writings signed, sealed and delivered. And the estoppel is mutual, as estoppel by deed always is and ought to be: Cruise's Digest, Title Estoppel by Deed, and .the cases referred to. These papers are, in our judgment, to be treated just as if Mr. Keaton had signed them and sealed them himself. And this is eminently true in this case. He puts his sons in possession, and takes and puts upon record these deeds, ·as describing the title they had to the land. He stands by and sees them trade with each other about them, and finally sees them go into the possession of a third person. Is charged with notice of the possession of that third person, and therefore with notice of his claim to be a purchaser for value, and now, years after, he comes before a court of equity asking that he be again restored to his original title.

3. The question, therefore, is, what is the legal effect of these sealed declarations, made by the sons ·and accepted by him and recorded, as descriptive of their right? As we have said, he is bound by them as though he had written, signed and sealed them—as though he had conveyed to the sons the

Keaton *et al. vs.* Jordan.

title they describe. And they are to be construed as though he had conveyed these lands to them "as part of their portion of his (my) estate, under his (my) will, and which (they) are to hold as (my) will directs after (my) death, and which is to be taken and considered as a part of (their) portion, directed to be given (them) by the will aforesaid." The plain meaning of these words would be that they took the property as an advancement, as their own, as their portion of his estate, or *part* of their portion. The reference to the will, if it has any legal meaning at all, is that, notwithstanding the delivery of these lands to the sons as their portion of his estate, the father has still the right to dispose of them by his will. This would make it an advancement and no advancement, a right and no right, a portion and no portion. He might make no will, or he might dispose of it any way he pleased. It would be a grant, reserving a right in the grantor wholly inconsistent with it, and, as we think, would fall within the settled rule that a reservation or condition repugnant to the grant is void. Deeds mean something, and a deed conveying property, reserving to the grantor the right to make or modify the grant at his will, amounts to nothing at all. A reader of these papers, as they stood on the record, would understand that the father had given these sons these lands as their portion of his estate for the love he bore them, reserving to himself the right, at his option, to revoke his gift, and as, in our judgment, this reservation was void, he would have a right so to treat it. It was contended, in argument, that it was a fair inference, from the words used, that the will was referred to as a will then existing, and that one reading the paper was thus notified that the paper on record did not purport to set forth the whole rights of the son, and that the reader, by calling on the father, might see the will, and thus see the real character of the son's title. But this, as it appears to us, is not a fair construction of these papers. Had this been intended, why not set out the precise nature of the title in the deed? And this involves, too, the absurdity of assuming

that a man has an effective, irrevocable will, years before his death.

4. What might be the effect of the understanding (parol) of the father and sons at the time, as between them, we do not say. If they have used words that did not convey their true meaning, perhaps, as between them, the mistake could be corrected; but this defendant is a purchaser for value, and innocent, and equity will not correct a mistake, or set up a concealed equity against such a defendant.

Judgment affirmed.